### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| VS. | * | DOCKET NO. 2:19-cr-99-GZS |
| | * | |
| JENNY SANTANA-VASQUEZ | * | |
| | * | |

### MOTION TO SUPPRESS EVIDENCE

Now comes the defendant, by and through counsel, and moves this Honorable Court to suppress as evidence at trial all evidence of any kind secured as a result of a motor vehicle stop, arrest,  and all subsequent investigative measures by law enforcement officers to which the defendant was subjected on or about December 26, 2018, near mile marker 32 in the north bound lane of the Maine Turnpike.  In support of this motion the defendant states as follows:

### Factual Background

On December 26, 2018, at approximately 10:50 p.m.,Trooper George Loder of the Maine State Police observed a vehicle being operated by the defendant on the Maine Turnpike speeding in excess of the posted limit. He pursued, and moments later initiated a stop of the vehicle. After running data base checks on the defendant's license and the vehicle registration, he determined that her New York license was suspended without a stated reason and the vehicle registration was also suspended for lapsed insurance. At approximately 11:05 p.m., Trooper Loder requested, via his radio dispatcher, that a drug dog and handler respond to the scene of the stop, and he then began to prepare a speeding citation for the defendant. He also requested a tow truck for the vehicle. After the stop had been in progress for approximately 20 minutes, Trooper Jesse Duda arrived with his drug dog, "Mack."

1

After Loder provided a summary of the stop, Duda and "Mack" began a scan of the exterior of the vehicle. This scan commenced after the stop had been in progress for approximately 28 minutes. "Mack" was led around the vehicle in an initial sweep. Next, Duda initiated the "targeting" phase of the search, and circled "Mack" around the vehicle in clockwise and counter clockwise directions. During this portion of the second sweep, Duda would "target" specific areas of the vehicle with his hand, and "Mack" would sniff those specific areas. Duda's report indicates that "Mack" alerted to the presence of narcotics by sitting in a "final response" position at two specific areas he had targeted: the open passenger window, and the grill of the front exterior of the vehicle. This part of the process took another five or six minutes. The search of the exterior of the vehicle appears on a video captured by the dash camera in Loder's vehicle. It should be noted that the video of the dog sniff search appears to be at odds with the description of "Mack's" behavior described in Duda's report as to the passenger window, and that the sniff search of the front of the defendant's vehicle was not in view of the camera.

After Duda tells Loder that the dog had "indicated" on the vehicle, the troopers decided to separate and question the two detainees. At the point where the stop had been in progress for 34 minutes, the defendant was ordered out of the vehicle and directed to join Loder in his vehicle. The passenger was also ordered out of the vehicle and directed to sit on the front bumper of Loder's cruiser. At the point where the stop had been in progress for 39 minutes, Duda commenced a full search of the interior of the vehicle. While the vehicle search was still in progress, 57 minutes into the stop, Loder directed the defendant out of the vehicle to assist in his interrogation of the passenger by translating his questions and the passenger's answers. It should be noted that it was approximately 20°F, or colder, at that time, with a light snow. The defendant was dressed in cotton

2

sweat pants and a cotton long sleeve sweatshirt that was cut off at the midriff, exposing the defendant's stomach to the elements. She was not wearing a coat, hat, scarf, or gloves. At the one hour point of the stop, the defendant was still standing outside in front of Loder's cruiser and can clearly be seen shivering. At the one hour and one minute point of the stop it appears that Duda has completed his search of the interior of the vehicle without finding any contraband. At the one hour and two minute point of the stop, the defendant and her passenger are positioned by the troopers to stand next to each other in the breakdown lane, and a personal dog sniff search of each individual was conduct by Duda with use of his dog "Mack." The nose of the dog was placed onto the crotch of each individual. Initially, the defendant was out of view of Loder's camera, but she came back into the view when Duda asked her to sit on the front bumper of Loder's cruiser. The dog was once again directed to place his nose onto her crotch as she sat on the cruiser's bumper. Trooper Duda wrote in his report that "Mack did not positively indicate to the presence of narcotics on either occupant of the vehicle."

At the one hour and five minute point of the stop, after the defendant has been standing outside in the cold for several minutes, and after a full search of the vehicle has come up empty and a sniff search of the vehicle occupants and not produced an alert by the dog, the defendant was confronted and interrogated by Trooper Duda as follows:

> "Duda: Jenny, come here. Listen, my dog indicated to the presence of narcotics. Hear me out a second, ok? If you've got a little something on you, which is something I would commonly see, we do this every night. If you have a little something on you, it's not the biggest deal in the world, if you are willing to give it to us, we'll probably just give you a summons, and not arrest you tonight. Um, you know, would an x-ray show something on you? I really don't want to have to go to those extremes, I think that you were probably put in this position by somebody else. You know you are probably making a little bit of money from it. We have the discretion not to

3

bring you to jail. And, a lot of times when people cooperate [unintllegible], so if you have something in you, we can get a female officer here, or go to the barracks or something and you give it to us. [to Trooper Loder] Are you ok with giving her a summons if that's the case?

Loder: Yeah.

Defendant: So I'm not going to jail?

Duda: You're not going to jail.  But we need to get it. Our main goal is we need to get this shit off the streets.

Defendant: Ok.

Duda: What is it?

Defendant: I don't even know, I just put it over there. But, he [passenger] doesn't even know nothing.

Duda: He doesn't?

Defendant: [unintellegible]

Duda: So, somebody else asked you to do this for them?

Defendant: Yes.

Duda: [To Loder]: Why don't we go to the barracks and deal with it there.

Duda: Ok, We're going to go to the barracks, you're going to ride with him. You're not under arrest. You're cold, obviously, we can talk more about it, the main thing I want you to understand is that we're not forcing you to do this, alright? What we have told you is something we're going to stick to our word, ok? So, you're going to have a seat in here and we're going to go down there and we're going to have a female sergeant meet us there, and we're going to figure out an arrangement for getting that out of you, Ok? Cause, our main concern is your safety obviously, getting that stuff off the street and we'll take it from there, ok?"

After Ray's Towing removed the defendant's vehicle, she was transported to the State Police

4

Barracks by Trooper Loder, where, upon arrival, and for the first time, she was administered the warnings pursuant to *Miranda v. Arizona*, 384 U. S. 436 (1966).

**Legal Arguments**

a.  **The investigative measures used by the police exceeded the scope of the justification for the stop**

A Terry stop must be objectively reasonable in terms of the initial stop and actions taken during the stop, and "must be reasonably related in scope to the stop itself unless the police have a basis for expanding their investigation." *United States v. Ruidiaz*, 529 F.3d 25, 28-29 (1st Cir. 2008). A stop that continues beyond the temporal scope necessary to effectuate a traffic stop so that a canine can complete a sniff search of the vehicle is unreasonable. *Rodriguez v. United States*, 135 S. Ct. 1609 (2015); *United States v. Sugar*, 322 F. Supp. 2d 85, 93 (D. Mass. 2004 (Saris, J.).

Here, the defendant argues that the facts known to the police did not justify a canine sniff search at its inception, and also did not justify the extended time of detention to facilitate completion of the dog sniff search of the vehicle. Further, when a full search of the vehicle did not reveal any contraband, and a subsequent canine search of the persons of the driver and passenger did not produce an alert by the canine on the person of either occupant of the vehicle, the police were obligated to immediately cease further investigative measures related to other criminal activity of the occupants of the vehicle, and release them. To have failed to do so was beyond the constitutional authority of the police under obtaining circumstances.

b.  **The totality of the circumstances show that the defendant was subjected to a *de facto* arrest without probable cause and interrogated without the benefit of *Miranda* warnings**

As a general rule, *Terry* stops do not implicate the requirements of *Miranda. United States v. Streifel*, 781 F.2d 953, 958 (1st Cir. 1986). A *Terry* stop can certainly morph into "custody,"

5

triggering the need for *Miranda* warnings "where the totality of the circumstances shows that a reasonable person would understand that she was being held to 'the degree associated with a formal arrest.'" *United States v. Fornia-Castillo*, 408 F.3d 52, 63 (1st Cir. 2005), citing *Stansbury v. California*, 511 U. S,. 99, 113 (1994). "Relevant factors bearing on whether an investigatory stop has evolved into a de facto arrest include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *Fornia-Castillo* at 63, citing *United States v. Ventura*, 85 F.3d 708, 711 (1st Cir 1996).

A person is in custody if a reasonable person in the same situation would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U. S. 99, 112 (1995). A determination of whether an environment is rendered custodial under *Miranda* depends on an evaluation of the totality of the circumstances, and the ultimate inquiry is whether a reasonable person in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest. *Stansbury v. California*, 511 U. S. 318, 323 (1994).

Under *Thompson*'s totality approach, it is not determinative of *Miranda* custody either that an officer announce a formal arrest, or that he makes a declaration that a suspect is not under arrest. *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993)(suspect in police car told he was not under arrest but interrogation was, nevertheless, custodial). Likewise, a statement from the interrogating officer that the suspect is not in custody, that he is free to leave, or that he may terminate the interview, does not necessarily render the interrogation

6

non-custodial. *United States v. Lee*, 699 F.2d 466, 467-68 (9th Cir. 1982) (holding that an interrogation in an FBI car was custodial even though the interrogating FBI agents told the suspect that he was free to leave or terminate the interview at any time); *United States v. Craighead*, 539 F.3d 1073, 1087-1088 (9th Cir. 2008) (suspect interviewed in a storage room at his own home was subjected to custodial interrogation despite being told his statements were voluntary, that he was free to leave, and that he was not under arrest and that he would not be arrested that day regardless of what information he provided); *United States v. Salabye*, 623 F. Supp. 2d 1010 (D. Ariz. 2009) (defendant subjected to custodial interrogation after he agreed to sit in a truck with one officer with the doors shut and the windows down to answer some questions, despite twice being told he was free to leave); *see also, United States v. Griffin*, 7 F.3d 1512, 1519 (10th Cir 1993); *United States v. Carter*, 884 F.2d 368, 371-72 (9th Cir. 1989). 'The *Miranda* test for custody does not ask whether the suspect was *told* that he was free to leave; the test aks whether a "reasonable person [would] have *felt* he or she was not at liberty to terminate the interrogation and leave."' *Craighead*, supra., 539 F.3d at 1088, *citng Thompson v. Keohane*, supra., 516 U. S. at 112.

The existence of probable cause from the officer's view, if communicated to the individual being questioned, is a factor to be considered in the custody analysis because it may affect how a reasonable person would perceive his freedom to leave. *Standsbury v. California*, 511 U. S. 318, 325 (1994). It is also significant to note that any "words or actions" by police that they know, or should have known, are likely to elicit an incriminating response, will qualify as interrogation. *Rhode Island v. Innis*, 446 U. S. 291, 300-302 (1980).

7

Additionally, probable cause for arrest exists when " 'the facts and circumstances within [the police officers'] knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent [person] in believing that the [defendant] has committed or is committing an offense.' " *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir.1987) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Arrest without probable cause violates the Fourth Amendment. *Wong Sun v. United States*, 371 U. S. 471, 479 (1963).

> **c.  The defendant's statements to, and cooperation with, Officer Duda were the direct result of promises made to her that she would not go to jail, and therefore her subsequent statements and actions were involuntary, and all fruits derived therefrom are inadmissable.**

In *Bram v. United States*, 168 U. S. 532, 549 (1897), the Supreme Court offered its first opinion about the government's use of confessions obtained as a result of methods that "engender in the mind of the accused hope or fear in respect to the crime charged." The oft-quoted standard set forth by the court stated:

> "A confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence."

> *Id.* at 549

Over the course of the Twentieth Century, this potent prohibition against the use of statements obtained through promises or threats has been significantly diluted. Now, the use of promises is considered to be one of many factors to be considered when judging the voluntariness of a confession based on the "totality of the circumstances." *United States v. Pinto*, 671 F. Supp. 41 (46-50 (D. Me. 1987)(Cyr, J.)(arresting officer's promise that he could keep defendant from going to jail if defendant cooperated rendered defendant's confession involuntary under totality of the

8

circumstances, despite administration of *Miranda* warnings). "It might be said that the modern focus is not on whether promises or threats were made, but on whether a defendant's confession was 'extracted' thereby." *United States v. Craig*, 2001 WL 761230, p.4 (D. Me., July 6, 2001)(Kravchuck, J.). If the government seeks to use a confession or its fruits, they first have the burden to demonstrate by a preponderance of the evidence the voluntariness of that confession. *Pinto*, supra. at 57, citing *Lego v. Twoomey*, 404 U. S. 477, 489 (1972). Second, the court must evaluate the voluntariness of the statement in the "totality of the circumstances." *Pinto*, supra. at 57, citing *Bryant v. Vose*, 785 F.2d 364, 367-68 (1st Cir. 1986). Third, in determining whether the statement was voluntary, the reliability or truth or falsity of the statement is not a factor to be considered. *Pinto*, supra. at 57, citing *Jackson v. Denno*, 378 U. S. 368, 385 (1964). Fourth, at least where the court is considering something *other* than a promise of leniency or other benefit, voluntariness turns upon "whether the will of the defendant has been overborne so that the statement was not his free and voluntary act ...," *Pinto*, supra. at 57, citing *Bryant*, 785 F.2d at 367-68.

The exchange between the defendant and trooper Duda reflects that his promise of "no jail" was central to the defendant's decision to tell the police she was carrying drugs and to cooperate in their recovery. It is clear that her confession was "extracted" by the police promise of leniency.

Wherefore, for the reasons asserted herein, the defendant prays that any and all evidence secured by the police as a result of her unlawful detention, her unlawful arrest without probable, her custodial interrogation without the benefit of *Miranda* warnings, and her involuntary statements and actions in direct response to police promises, be suppressed as evidence at trial.

9

Dated: August 4, 2019                    /s/ J. Hilary Billings
                                         J. Hilary Billings, Esq
                                         Assistant Federal Public Defender
                                         Counsel for the Defendant
                                         P.O. Box 595
                                         Portland, Me 04112-0595
                                         207-553-7070
                                         FAX: 553-7017
                                         J.Hilary.Billings@fd.org

## CERTIFICATE OF SERVICE

I, J. Hilary Billings, hereby certify that I have caused, this date, the within Motion to Extend Time and Continue to be served upon Assistant United States Attorney Nicholas Scott, Esq., by forwarding a copy to him, via the Court's ECF System.

Dated: August 4, 2019                    /s/ J. Hilary Billings
                                         J. Hilary Billings, Esq.
                                         Counsel for the Defendant