**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket no. 2:19-cr-00099-GZS |
| JENNY SANTANA-VASQUEZ, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER ON MOTION TO SUPPRESS**

Before the Court is Defendant Jenny Santana-Vasquez's Motion to Suppress Evidence (ECF No. 34). On October 13 and December 9, 2021, the Court held in-person evidentiary hearings on this Motion. Having considered the evidence and arguments before it, the Court DENIES the Motion for the reasons explained herein.

## I.     FACTUAL FINDINGS

On the cold and snowy night of December 26, 2018, Maine State Trooper George Loder was observing northbound traffic from the median of the Maine Turnpike at Mile Marker 31.1. At approximately 10:50 P.M., using a radar speed detector, Trooper Loder clocked a white Jeep Grand Cherokee with a New York license plate traveling at 91 miles per hour. The Turnpike's speed limit on the relevant stretch of highway was 70 miles per hour. Trooper Loder pulled the Jeep over a short distance beyond the Biddeford exit. Present in the Jeep were the driver, Defendant Jenny Santana-Vasquez, and a male passenger. Santana-Vasquez was wearing only a sweatshirt.

As Trooper Loder approached the Jeep, he observed through the rear window that the Jeep's rear cargo area did not contain winter jackets or much luggage. At the driver's window,

Trooper Loder requested Santana-Vasquez's driver's license and the Jeep's registration certificate. Santana-Vasquez produced a New York State driver's license but was unable to produce a registration certificate, claiming that the Jeep belonged to her cousin.  Santana-Vasquez stated she was en route to visit another cousin but could not name the town to which she was headed, instead showing Trooper Loder her phone and claiming that she was navigating using a GPS application.

Trooper Loder returned to his cruiser and checked the validity of Santana-Vasquez's license and the Jeep's registration using a mobile data terminal.  The terminal reported at 10:55 P.M. that the Jeep was registered in another person's name at a New York City address, and that the registration had lapsed.  It also showed, at 11:00 P.M., that Santana-Vasquez's license was suspended.  Before exiting the cruiser, at 11:02 P.M., Trooper Loder radioed dispatch and requested a narcotics detection K-9, if one was available in the area.  Several factors up to that point had led him to suspect the possibility of illicit activity afoot:  Santana-Vasquez's paucity of luggage, apparent gifts, or winter clothing on a long trip out of state the day after Christmas, her inability to name her destination (more than six hours from her home address) or the owner of the Jeep, the Jeep's lapsed registration, and Santana-Vasquez's failure to produce the car's registration certificate.  Dispatch responded that Trooper Jesse Duda and his K-9, Mack, were on their way.

Trooper Duda and Mack have been certified as a pair in narcotics detection since 2016. Mack is trained to detect cocaine (including crack cocaine), methamphetamine, and heroin, but (like all K-9s in Maine) not fentanyl.  Mack signals the odor of narcotics through "just noticeable differences," such as intense nasal exchanges, excitement, and head snaps, and through "final indications," during which Mack sits and looks at the source of the odor.  On several occasions since his initial certification, Mack has made "false alerts" to the presence of narcotics when none were present.  Nevertheless, Mack's error rate falls within the range deemed acceptable by the

2

Maine Criminal Justice Academy ("MCJA").  Mack has continuously been recertified as a narcotics detector, passing each required MCJA re-certification test annually.

Trooper Loder reapproached Santana-Vasquez's window and asked again for the name of the cousin in which the vehicle was registered. Santana-Vasquez hesitated and was ultimately unable to give Trooper Loder a name.  In fact, Santana-Vasquez had borrowed the Jeep from a drug trafficker called "50."  Trooper Loder informed her that the Jeep's registration was suspended, and asked if Santana-Vasquez's male passenger had a valid driver's license.  Santana-Vasquez answered in the negative.  Trooper Loder again returned to his cruiser at 11:14 P.M. and summoned a tow truck to remove the vehicle and transport its passengers.

At approximately 11:17 P.M., Trooper Duda and Mack arrived on the scene and began a sniff of the Jeep's exterior.  Trooper Duda took Mack around the car several times while Santana-Vasquez and her passenger remained inside.  Mack briefly sat down next to the passenger side window at approximately 11:21 P.M. and again at approximately 11:22 P.M.  Trooper Duda observed Mack exhibit final indications to the odor of narcotics during the sniff twice:  once on the passenger side of the Jeep, and once in front of the Jeep (out of view of the troopers' dashboard camera).  Trooper Duda also observed Mack exhibit several just noticeable differences before coming to final indication.

During the sniff, Trooper Loder remained in his cruiser and attempted to determine why the Jeep's registration had been suspended.  Trooper Loder testified that accessing such information through out-of-state motor vehicle registries can be a time-consuming, iterative process.  Trooper Duda returned to Trooper Loder's cruiser at 11:24 P.M. and informed him that Mack had indicated the presence of narcotics on the vehicle.  Relying on his experience, Trooper Duda at this point suspected Santana-Vasquez to be trafficking narcotics.

At Trooper Duda's request, Santana-Vasquez exited the Jeep. Trooper Loder invited Santana-Vasquez to sit in his cruiser's passenger seat while they spoke. Trooper Loder issued Santana-Vasquez a summons for operating a vehicle without a license. At the time, Trooper Loder did not intend to arrest Santana-Vasquez, but rather to release her with the tow truck. During their conversation, Santana-Vasquez told Trooper Loder that her passenger, whom she referred to as "Jose,"[1] was present in the country legally. The passenger later informed Trooper Loder that he did not "have papers."

While Trooper Loder and Santana-Vasquez sat in the cruiser, Trooper Duda asked the passenger to exit the vehicle and frisked him. Trooper Duda then searched the Jeep. A tow truck arrived at 11:30 P.M., in the middle of Trooper Duda's search. Trooper Duda concluded his search at 11:52 P.M., having found no indicia of illegal activity. Trooper Duda then had Mack sniff Santana-Vasquez and her passenger. Mack did not indicate the odor of narcotics during this sniff.

At 11:56 P.M., Trooper Duda told Santana-Vasquez that his dog had indicated the presence of narcotics on the vehicle. Suspecting that she might be carrying narcotics in her person because the car search had come up empty, Trooper Duda said, "if there's a little something on you, it's not the biggest deal in the world . . . if you willingly give it to us, we can probably just give you a summons, and not arrest you tonight." Next, Trooper Duda said, "would an x-ray show something on you? I really don't want to have to go to those extremes." He added, "we have the discretion not to bring you to jail." Trooper Duda then asked Trooper Loder, "are you okay with giving her a summons if that's the case?"

 After Trooper Loder confirmed that he would be comfortable releasing Santana-Vasquez with a summons, Santana-Vasquez asked, "so, I wouldn't go to jail?" Trooper Duda responded

---

[1] At the December 9 hearing, Santana-Vasquez testified that her passenger's name was not, in fact, "Jose."

that Santana-Vasquez would not go to jail, and that the troopers' priority was "to get this [stuff] off the street." Santana-Vasquez responded "okay," leading Trooper Duda to ask what sort of drug was inside her. Santana-Vasquez answered that she did not know.

Trooper Duda then outlined a plan to return to the police barracks and to have a female officer supervise Santana-Vasquez in removing any contraband from her person. He stressed to her that she was not under arrest, and that she was not being forced to cooperate. Santana-Vasquez accompanied the troopers to Maine State Police Troop G Barracks in Portland. Trooper Loder read Santana-Vasquez her <u>Miranda</u> rights after arrival at the barracks. Santana-Vasquez confirmed that she was carrying something inside of her. Sergeant Angela Porter escorted Santana-Vasquez into a bathroom, where Santana-Vasquez removed and surrendered a condom that held 99.9 grams of "tan chunky material" containing fentanyl. (Gov't Ex. 7.)

## II.    DISCUSSION

Defendant advances three arguments for suppressing the verbal and physical evidence Troopers Loder and Duda obtained in their encounter with her. First, Defendant contends that the police exceeded the valid temporal scope of a traffic stop. Next, Defendant claims that the stop began as an investigatory stop, but transformed into a "de facto arrest." Two violations stem from this evolution, in Defendant's telling: (1) the de facto arrest was not supported by probable cause; and (2) Defendant was deprived of the warnings against self-incrimination guaranteed by <u>Miranda</u> <u>v. Arizona</u>, 384 U.S. 436 (1966). Third and finally, Defendant alleges that Trooper Duda's post-search conversation with her illegally coerced her into confessing wrongdoing.

### A.    Duration of the Stop

The Fourth Amendment forbids unreasonable searches and seizures. U.S. Const. amend. IV. "Because even a temporary police detention constitutes a seizure under the Fourth

Amendment, that detention must be reasonable in order to pass constitutional muster." United States v. Ruidiaz, 529 F.3d 25, 28 (1st Cir. 2008). A temporary police detention, or "Terry stop," is reasonable when it is "supported by a reasonable and articulable suspicion of criminal activity." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001) (citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984)); see also Terry v. Ohio, 392 U.S. 1 (1968). Generally, traffic stops qualify as Terry stops. See Knowles v. Iowa, 535 U.S. 113, 117 (1998).

"There is no talismanic time beyond which any stop initially justified on the basis of Terry becomes an unreasonable seizure under the fourth amendment." United States v. Quinn, 815 F.2d 153, 157 (1st Cir. 1987) (internal quotation marks and alterations omitted). However, "[a] seizure justified only by a police-observed traffic violation . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission" of addressing the violation. Rodriguez v. United States, 575 U.S. 348, 350 (2015) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)) (internal quotation marks and alterations omitted).

Importantly, the acceptable scope and duration of a traffic stop are not cabined by the stop's original justification if the police discover new suspicious information during the stop. Rather, "as an investigation unfolds, an officer's focus can shift, and he can increase the scope of his investigation by degrees when his suspicions grow during the stop." United States v. Dion, 859 F.3d 114, 125 (1st Cir. 2017) (internal quotation marks omitted).

Here, the police did not unconstitutionally prolong their stop of Defendant because, at each step of their investigation, the measures they took were "fairly responsive to the emerging tableau." Dion, 859 F.3d at 125 (quoting Ruidiaz, 529 F.3d at 29) (internal quotation marks omitted). Having initially pulled Defendant over for traveling more than twenty miles per hour above the speed limit, Trooper Loder was justified in determining whether to issue a ticket and carrying out

"ordinary inquiries incident to the traffic stop." Rodriguez, 575 U.S. at 355 (quoting Caballes, 543 U.S. at 408) (internal alteration omitted). Such ordinary inquiries may include a check of the driver's license and registration. See Rodriguez, 575 U.S. at 355.

Immediately upon running Defendant's license number and the Jeep's registration information though the police database, however, Trooper Loder learned that Defendant could not legally drive and the Jeep could not legally be driven. Driving without a license and driving without valid registration are Class E misdemeanors, and arrestable offenses under Maine law when committed in the officer's presence. See 17-A M.R.S.A. § 15(1)(B); 29-A M.R.S.A. §§ 2412-A, 2415 & 2417. Thus, in the moment Trooper Loder accessed Defendant's license and registration information, the constitutional scope of the stop expanded to include any time necessary for a tow truck to arrive. Accord United States v. Betts, 806 Fed. Appx. 426, 430 (6th Cir. 2020) (holding that where a driver possessed a suspended license and the vehicle's registration was invalid, the police's "Terry-based seizure was thus justified in continuing until a tow truck arrived"). Because Mack's sniff of the Jeep occurred before the tow truck arrived and thus did not prolong the stop, the sniff was permissible. See Rodriguez, 575 U.S. at 354.

Mack's two alerts to the odor of narcotics before the tow truck arrived further enlarged the permissible scope of the stop. See United States v. Sharpe, 470 U.S. 675, 685 (1985) ("[W]e have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes."); United States v. Ramdihall, 859 F.3d 80, 90 (1st Cir. 2017) ("Reasonable suspicion may . . . develop during the course of an ordinary traffic stop so as to justify extending the seizure beyond the time needed to accomplish its original purpose."). Both Trooper Duda and Sergeant Scott Dalton, principal K-9 trainer for the Maine State Police, established Mack's reliability in their testimony. See Florida v. Harris, 568 U.S. 237,

246 (2013) ("[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert."). But even if Mack did not actually alert to the presence of narcotics, Trooper Duda's reasonable conclusion to that effect (which the Court credits) would still form a basis for reasonable suspicion. See Heien v. North Carolina, 574 U.S. 54, 61 (2014) ("We have recognized that searches and seizures based on mistakes of fact can be reasonable.").

Defendant attacks the conclusion that Mack actually alerted on several grounds, none of which convinces the Court. First, Defendant points out that Mack is not trained in fentanyl detection. Nevertheless, Defendant testified to having borrowed the Jeep from a drug dealer, indeed the same dealer who provided the drugs later obtained from her person. It is conceivable that the same vehicle was recently used to carry other drugs, of a type Mack was trained to detect. See Harris, 568 U.S. at 245–46. Defendant also cites the various false alerts Mack's training records show over the course of years to demonstrate his unreliability. But, crucially, Mack has been recertified without interruption annually because his errors fit within the range sanctioned by Maine's state standards. Those false alerts thus provide little basis to question his reliability in the sniff at hand. See id.

Finally, relying on the video footage, Defendant claims that Mack never actually alerted to the odor of narcotics; alternatively, she suggests that Trooper Duda impermissibly cued Mack into giving a false alert. The Court rejects Defendant's argument for two reasons. First, Trooper Duda credibly testified that one of Mack's indications took place in front of the vehicle, out of view from the dashboard camera's perspective. Second, giving due weight to the testimony of Trooper Duda and Sergeant Dalton, the Court concludes that Mack's on-screen behavior is consistent with the just noticeable differences and final indications these witnesses described. Mack can be observed

to sniff excitedly, and to sit briefly in the spot Trooper Duda testified that he did.  Thus, the Court finds that Mack indicated to the odor of narcotics on or around Defendant's Jeep.

Mack's alerts standing alone would be sufficient to establish reasonable suspicion to continue the detention at this point.  Cf. Harris, 568 U.S. at 246–47 ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.").  Even were the alerts per se insufficient, the other indicia of possible illegal activity observed by the troopers in the lead-up to Mack's alerts further support a finding of reasonable suspicion to investigate for drug-related activity.  Defendant claimed to be traveling to a town she could not name, hours away from home, with less luggage and warm clothing than might be anticipated under the circumstances.  Her license was suspended.  The Jeep's registration was invalid, and was purportedly registered to a cousin Defendant could not name.  Defendant was driving at night on a corridor well known to be used to transport narcotics into Maine.  Finally, a K-9 trained in narcotics detection indicated on her vehicle.  Viewing the totality of the circumstances, then, there was ample basis for reasonable suspicion.  See Dion, 859 F.3d at 125 (instructing courts to consider the totality of the circumstances and citing travel on a drug-trafficking corridor as a contributor to reasonable suspicion); United States v. Molina-Gomez, 781 F.3d 13, 20 (1st Cir. 2015) (defendant's inability to name the friend he claimed to be visiting helped to establish reasonable suspicion).

Given the reasonable suspicion that these facts established, it was appropriate for Trooper Duda to have Mack sniff Defendant and her passenger, and to ask Defendant whether she was carrying drugs internally.  The stop thus did not exceed its permissible constitutional scope.  See United States v. Rasberry, 882 F.3d 241, 248 (1st Cir. 2018) ("The stop in this case was

proportional to the circumstances and lasted no longer than was reasonably necessary to search the motel room and dispel suspicion that illegal drugs were hidden there."); United States v. McCarthy, 77 F.3d 522, 531 (1st Cir. 1996) ("[T]he record clearly belies any contention that the police officers involved neglected to employ any reasonably available alternative methods that could have significantly shortened their inquiry.").

### B.      De Facto Arrest

"[W]hat starts out as an investigatory stop may morph into a de facto arrest." Morelli v. Webster, 552 F.3d 12, 19 (1st Cir. 2009).   Two legal consequences flow from such a transformation.  First, an arrest—including a de facto arrest—"must be grounded on a showing of probable cause," a more stringent requirement than the "reasonable suspicion" that suffices to justify an investigatory stop.  Id.  Second, an investigatory stop's evolution into a de facto arrest triggers the necessity of Miranda warnings before interrogation, which are generally not required in routine traffic stops.  See Stansbury v. California, 511 U.S. 318, 322–24 (1994); Berkemer, 468 U.S. at 437; United States v. Campbell, 741 F.3d 251, 267 (1st Cir. 2013).  Here, Defendant characterizes her encounter with the police as a de facto arrest.  Defendant further claims that the arrest was not grounded in probable cause and that she was not Mirandized, and thus that Troopers Loder and Duda violated her Fourth and Fifth Amendment rights.

"There exist no scientifically precise benchmarks for distinguishing between temporary detentions and de facto arrests."  United States v. Chaney, 647 F.3d 401, 409 (1st Cir. 2011) (internal quotation marks omitted).  The first step in making the distinction is to ask "whether a reasonable person in the suspect's position would have understood her position 'to be tantamount to being under arrest.'"  Id. (quoting United States v. Zapata, 18 F.3d 971, 975 (1st Cir.1994)). The totality of the circumstances is relevant in answering this question, including "whether the

suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." United States v. Melo, 954 F.3d 334, 340 (1st Cir. 2020) (internal quotation marks omitted). Controlling are the "objective circumstances of the interrogation, not . . . the subjective views harbored by either the interrogating officers or the person being questioned." Id. (internal quotation marks omitted). Factors bearing on the intrusiveness of the police's behavior may also be relevant: for example, "the force (if any) that was exerted, the information conveyed to the detainee, and the severity of the intrusion." Rasberry, 882 F.3d at 247; see also United States v. Acosta-Colon, 157 F.3d 9, 14–15 (1st Cir. 1998).

For Miranda purposes, the de facto arrest inquiry entails analysis of a second set of factors aimed at determining "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Melo, 954 F.3d at 340 (internal quotation marks omitted). Restated, this question becomes "whether there is enough pressure on a person to sufficiently impair his free exercise of his privilege against self-incrimination." United States v. Cruz-Rivera, 14 F.4th 32, 50 (1st Cir. 2021).

The Court finds that Defendant's investigatory stop by the police did not morph into a de facto arrest for purposes either of probable cause or of Miranda warnings. The relevant encounter took place entirely in a neutral location, on the side of the Maine Turnpike. See United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999) ("[A] public highway is a neutral setting that police officers are not in a position to dominate as they are, for example, an interrogation room at a jailhouse."). Only two officers were present at the scene and thus "[t]here is no indication that [the] police-to-suspects ratio was overwhelming to the defendant[.]" Campbell, 741 F.3d at 267; see also United States v. Crooker, 688 F.3d 1, 12 (1st Cir. 2012) (holding Miranda warnings

unnecessary where "no more than two agents were in direct conversation with [the defendant] at one time"). Defendant was never physically restrained. See Quinn, 815 F.2d at 160. But see Morelli, 552 F.3d at 20–21. Though the officers were in uniform and armed, they never drew their weapons or used them to intimidate Defendant or her passenger. See Chaney, 647 F.3d at 409 (describing the use of drawn guns and handcuffs as "some of the most recognizable indicia of a traditional arrest") (internal quotation marks omitted).

Finally, the total duration and character of the stop were not so excessive as to suggest a de facto arrest. As described above, the officers carried out their investigative tasks with dispatch and responded to the circumstances as they revealed themselves. See Sharpe, 470 U.S. at 685; McCarthy, 77 F.3d at 530. The stop's total duration—approximately seventy minutes—was not excessive in light of these considerations. Furthermore, the "atmospherics" of Defendant's stop by the police were "calm and nonthreatening." United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2011). The police spoke calmly and politely with Defendant and her companion. They reiterated several times that she was not under arrest. See Stansbury, 511 U.S. at 325 ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."). The intrusiveness of Mack's sniff of Defendant, while appreciable, does not affect this outcome. See United States v. Pontoo, 666 F.3d 20, 30 (1st Cir. 2011) ("We recognize the intrusiveness of the measures taken, but that is only part of the equation."). Understood in the context of the foregoing factors, Mack's sniff was more consistent with an investigative stop than a formal arrest.

Taking stock, under these circumstances, "a reasonable person would have believed only that he was being detained for investigation, not placed under arrest." United States v. Trueber, 238 F.3d 79, 94 (1st Cir. 2001); see also Campbell, 741 F.3d at 267 (finding no de facto arrest

where "[t]here is no indication that the stop lasted for an inappropriately long period of time or that the officers acted with hostility toward the defendants."). It is therefore unnecessary to determine whether the police had probable cause to sustain their investigation. Furthermore, when Defendant agreed to accompany the officers to the barracks, her consent sufficed to justify the police's continued interactions with her. See Florida v. Royer, 460 U.S. 491, 501 (1983).

For the same reasons, the Court finds at the second step of the inquiry that the risk of coercive pressures was not so great as to require Miranda warnings. See Cruz-Rivera, 14 F.4th at 50–51 ("True, a reasonable person in [defendant's] position would not have thought himself free to walk away -- it is reasonable that they would have understood something more than a routine traffic stop was in progress -- but on the broad spectrum from a speeding ticket to a grilling in the squad room, the events here were short of any de facto arrest or custodial interrogation[.]" (internal quotation marks and alterations omitted)).

### C.  Involuntary Confession

Defendant's final claim is that the police coerced her into a confession in violation of the Fifth Amendment's Self-Incrimination Clause, and thus that her confession and the fruits of her cooperation with the police should be suppressed. Specifically, Defendant alleges that Trooper Duda coerced her when he suggested that he had authority to have her x-rayed, and when he told Defendant she would not go to jail if she produced the drugs he believed her to be carrying.

Assessing the voluntariness of a confession requires examining the totality of the circumstances, balancing "the officers' tactics with the unique background of each individual suspect," to determine "whether the government's conduct overtook the will of the defendant." United States v. Hufstetler, 782 F.3d 19, 22 (1st Cir. 2015). "Relevant considerations may include the length and nature of the questioning, any promises or threats made, and any deprivation of

13

essentials[.]"  United States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011).  "They also include the defendant's personal circumstances, including his age, education, intelligence, and mental condition, as well as his prior experience with the criminal justice system."  United States v. Jacques, 744 F.3d 804, 809 (1st Cir. 2014) (internal citation omitted).

With regard to the police's conduct, "[o]nly confessions procured by coercive official tactics should be excluded as involuntary."  United States v. Boskic, 545 F.3d 69, 78 (1st Cir. 2008) (internal quotation marks and alteration omitted); see also Bryant v. Vose, 785 F.2d 364, 368 (1st Cir. 1986) (finding a confession voluntary where it was not "the product of coercion or other improper tactics.").  Not all trickery constitutes coercion.  See United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998).  Even "a false assurance to a suspect that he was not in danger of prosecution" can fall short of overbearing a suspect's free will.  Id.  Accordingly, the Byram court found no coercion despite the police's promises that the defendant "was not implicated in any of this" because "[a]t no point did the police threaten violence or serious retaliation if Byram refused to speak; the questioning was not prolonged; and the atmosphere at the . . . interview appears to have been benign."  Id. at 406 & 408 (internal quotation marks and alteration omitted).  Byram's holding applies even to intentional police deception.  See Boskic, 545 F.3d at 79 (construing United States v. Flemmi, 225 F.3d 78, 91 n.5 (1st Cir. 2000)).

Police trickery may cross the line into unconstitutional coercion where it introduces a "completely extrinsic consideration" like a threat not directly related to the case at hand.  Boskic, 545 F.3d at 80 (indirectly quoting Holland v. McGinnis, 963 F.2d 1044, 1051–52 (7th Cir. 1992); accord Hughes, 640 F.3d at 439 ("Careful perscrutation of the record fails to disclose any extrinsic factors introduced by the troopers that could have distorted the defendant's judgment about whether to speak freely to them.").  For example, the Court in Lynumn v. Illinois found the

14

petitioner's confession involuntary because police told her they would take her children away from her, and ensure they did not receive government aid, if she did not cooperate.  372 U.S. 528, 534 (1963).  The extrinsic consideration in <u>Lynumn</u> was "an empty but plausible threat to take away something to which she and her children would otherwise be entitled."  <u>Boskic</u>, 545 F.3d at 80 (internal quotation marks omitted).

The prevailing circumstances on the night in question lead the Court to conclude that Defendant's confession and cooperation with police were voluntary.  Trooper Duda's questioning lasted only a minute or two before she agreed to cooperate with him.  Defendant appeared calm and lucid throughout the encounter, including when she agreed to cooperate with the police.  <u>See</u> <u>Jacques</u>, 744 F.3d at 809 ("A defendant's calm demeanor and the lucidity of his statements weigh in favor of finding his confession voluntary.") (citing <u>United States v. Rojas-Tapia</u>, 446 F.3d 1, 8 (1st Cir. 2006)).  Defendant was approximately thirty-two years old at the time of the stop, had completed a high school education, and was of normal intelligence.  <u>See</u> <u>Hughes</u>, 640 F.3d at 438 (confession voluntary where "[t]he defendant was mature but not elderly. He had a high school education and had taken some college courses. There is no indication that he suffered from low intelligence.").  While Defendant disputes her understanding of English, she clearly appears to understand the content of her exchanges captured on video with the officers.  Furthermore, Defendant herself testified that she speaks and understands English.  These characteristics point toward a finding of voluntariness.

Furthermore, the Court concludes that Trooper Duda's statements did not overbear Defendant's free will in the circumstances described above.  For starters, the Court finds no clear examples of false promises or trickery.  Trooper Duda asked Defendant if an x-ray would reveal something on her, and stated he would prefer not to "go to those extremes."  Trooper Duda may

have intended to seek a warrant to x-ray Defendant if she did not cooperate; in any event, the Court does not understand his statement about an x-ray to be a threat of a measure clearly beyond his powers to undertake.  Furthermore, in context, Trooper Duda's promise that Defendant would not "go to jail" is best understood as a promise not to detain her in jail on that particular evening, not that she would never face prosecution.  The most obvious support for this conclusion comes from Trooper Duda's question to Trooper Loder about whether Loder would be comfortable releasing Defendant with a summons if she cooperated.  The possibility that Defendant was confused appears diminished in light of the fact that Trooper Loder had just issued her a summons minutes before, with instructions to appear in court.

Even if Trooper Duda's statements are properly construed as threats, they were not so severe as to amount to unconstitutional coercion.  Absent extenuating circumstances not present here, police are permitted to engage in "consciously misleading conduct" without crossing into impermissible coercion.  Boskic, 545 F.3d at 79.  As described above, Trooper Duda had only a very short conversation with Defendant before she agreed to accompany him to the police station.  After that short time, Defendant agreed to cooperate quite quickly and without showing signs of duress.  Trooper Duda never threatened "violence or serious retaliation" if Defendant did not cooperate.  Byram, 145 F.3d at 408.  He did not introduce any extrinsic considerations that might overbear her will.  But see Lynumn, 372 U.S. at 534.  In sum, the Court concludes Defendant was not coerced by Troopers Loder and Duda into confessing or cooperating with them.

Certain factors present at the scene undeniably incentivized Defendant's cooperation with the police.  Clad only in a sweatshirt, she was hours from home on a snowy evening with a vehicle borrowed from a drug dealer, far away from her three young children, with an undocumented companion.  She may well have wanted to get home quickly, and to avoid confrontation that might

16

jeopardize her possession of the Jeep or her passenger's presence in the United States (especially given the officers' repeated attempts to ascertain his identity).  Where the police know of an individual's mental vulnerability, the bar for coercive behavior is lower.  See Hughes, 640 F.3d at 438–39.  Here, however, the police did not know any of these facts and therefore could not exploit them.  The police did know that Defendant was made uncomfortable by the cold, but they did not use that fact to coerce her.  Indeed, Trooper Loder had immediately previously invited Defendant to warm herself in his cruiser.  The Court thus finds that any discomfort Defendant experienced fails to call into question the voluntariness of her confession, and that she had "sufficient control over [her] own choices" to confess voluntarily.  Hufstetler, 782 F.3d at 26.

### III.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Evidence (ECF No. 34) is hereby DENIED.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 21st day of December, 2021.